898 F.2d 230
 29 Fed. R. Evid. Serv. 1223
 UNITED STATES of America, Appellee,
v.
Peter BOYLAN, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
John E. CAREY, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Thomas J. CONNOLLY, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Matthew A. KILROE, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
John F. McCORMICK, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Kenneth J. NAVE, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Francis X. SHEEHAN, Defendant, Appellant.
 Nos. 88-2214 to 88-2220.
 United States Court of Appeals,
First Circuit.
 Heard Dec. 6, 1989.
Decided March 14, 1990.
 
 Thomas R. Dyson, Washington, D.C., with whom Albert Cullen, Jr., Boston, Mass., Robert D. Luskin, Jonathan A. Knee, Powell, Goldstein, Frazer & Murphy, Clifford M. Sloan, and Onek, Klein & Farr, Washington, D.C., were on brief, for appellant Thomas J. Connolly.
 Robert D. Luskin, with whom Jonathan A. Knee, Powell, Goldstein, Frazer & Murphy, Clifford M. Sloan, and Onek, Klein & Farr, Washington, D.C., were on brief, for remaining appellants.
 Paul Buckley, Milton, Mass., on brief, for appellant Peter Boylan.
 Regina Quinlan, Boston, Mass., on brief, for appellant John E. Carey.
 Anthony Traini and Leppo & Traini, Randolph, Mass., on brief, for appellant Matthew A. Kilroe.
 Anthony M. Cardinale, Boston, Mass., on brief, for appellant John F. McCormick.
 Paul F. Markham, Boston, Mass., on brief, for appellant Kenneth J. Nave.
 Robert Muse, Washington, D.C., on brief, for appellant Francis X. Sheehan.
 Diane M. Kottmyer and James B. Farmer, Sp. Attys., U.S. Dept. of Justice, with whom Wayne A. Budd, U.S. Atty., Boston, Mass., was on brief, for U.S.
 Before TORRUELLA and SELYA, Circuit Judges, and COFFIN, Senior Circuit Judge.
 SELYA, Circuit Judge.
 
 
 1
 Oliver Wendell Holmes is generally credited with pointing out that "we live by symbols"--and few symbols are better recognized than the lawman's badge. Yet the badge, like other emblemata of power, can be tarnished. These appeals present what the government believes--and defendants steadfastly deny--is a classic example of the genre.
 
 I. TRAVEL OF THE CASE
 
 2
 A federal grand jury returned a 58-count indictment against appellants, former members of the Boston Police Department (BPD). During the relevant period, defendant Carey was a detective sergeant. Defendants Boylan, Kilroe, McCormick, Nave, and Sheehan were under Carey's supervision. Defendant Connolly was Sheehan's partner for a time. The indictment charged the defendants with violating the Racketeer Influenced and Corrupt Organizations Act (RICO), by participating in the affairs of an enterprise, the BPD, through a pattern of racketeering activity, 18 U.S.C. Sec. 1962(c) (1982), and with racketeering conspiracy, 18 U.S.C. Sec. 1962(d) (1982). The remainder of the indictment was checkerboarded, charging various defendants with various violations, and combinations of violations, of the Hobbs Act, 18 U.S.C. Secs. 1951, 1952 (1982), certain mail fraud statutes, 18 U.S.C. Secs. 1341, 1342 (1982), and the like. The specific offenses did double duty, serving (with some supplementation) as predicate acts undergirding the RICO charges.
 
 
 3
 Count 33 was dropped before trial. The defendants were tried together on the remaining charges. With minor exceptions--the jury acquitted Nave and Sheehan on one Hobbs Act count and acquitted Nave on a mail fraud charge--all defendants were convicted on all counts. Following the denial of sundry posttrial motions and the imposition of sentence, appeals were taken across the board.
 
 
 4
 Initially, we set forth the case's background. We then turn to the meat of defendants' menu of assigned errors, discussing the more colorable contentions and rejecting the remainder without comment. In the interests of clarity and for ease in reference, we have prepared an appendix summarizing the indictment and will henceforth assume the reader's familiarity with it.
 
 II. BACKGROUND
 
 5
 In Boston, a Licensing Board (Board) regulates the dispensation and service of liquor, licensing vendors and enforcing state and municipal laws and regulations governing, inter alia, sales of alcoholic beverages, occupancy limits, conduct of licensed premises, and hours of operation. If rules are broken, the Board may impose penalties ranging from a warning, to probation, to suspension or revocation of an establishment's license. All Boston police detectives are considered agents of the Board responsible for inspecting licensed premises and reporting infractions; they are empowered to apply for criminal complaints and file charges with the Board as may be necessary.
 
 
 6
 Detectives are also eligible for private duty on their own time--duty which can be quite lucrative. The BPD's rules prohibit policemen from providing such private services except through official channels, i.e., in accordance with the police unions' collective bargaining agreements and BPD regulations, and for set fees. These rules safeguard the equal distribution of income-supplementing opportunities, ensure that matters remain aboveboard, and deter potential abuses. Officers are flatly prohibited from accepting more generous remuneration or performing details not posted and assigned through the proper departmental offices.
 
 
 7
 Between 1975 and 1986 each defendant was assigned for some period of time to work nights in District 4, encompassing Back Bay, the Fenway section, and certain other Boston neighborhoods. District 4 is a hotbed of nightclubs, saloons, and other establishments, including some so-called "gay bars," where appetites can be satisfied and thirsts slaked. According to the indictment, many of the alleged offenses occurred when defendants accepted cash payments outside the rules from proprietors of licensed establishments. Typically, the payments--anywhere from $100 to $600 per officer per occasion--were made during holiday season and at "vacation time." The defendants were said to have reciprocated by rendering favors ranging from the relatively innocuous (e.g., the provision of escort services when bank deposits were made; preferentially quick responses to disturbances) to the downright sinister (e.g., behind-the-scenes "help" in handling "problems" with the police; quashing of charges; influencing the Board's regulatory and enforcement actions). In the indictment, these events were clustered into several series of racketeering acts. Each series bore a letter designation corresponding to a separate person with some interest in a particular locus.
 
 III. RACKETEERING
 
 8
 We begin with the contention that the evidence failed to show either a linked pattern of racketeering activity or a RICO conspiracy.
 
 
 9
 A. Evidentiary Sufficiency.
 
 
 10
 Defendants claim that the aggregate proof indicated only dubious free-lancing by some officers or, at worst, a cluster of small, disconnected, nickel-beer conspiracies.[1] We summarize the alphabetized series of racketeering acts which the indictment alleged and the proof depicted, basing our narrative upon "the evidence in its totality, taken in the light most flattering to the government, together with all legitimate inferences to be drawn therefrom, in an effort to ascertain whether a rational trier of the facts could have found the appellant[s] guilty beyond any reasonable doubt." United States v. Tierney, 760 F.2d 382, 384 (1st Cir.), cert. denied, 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985).
 
 
 11
 1. Series A. Norman Chaletzky owned interests in three nightclubs: 88 Queensbury; the 1270; and the Kentucky Tavern. From 1979 to 1986, Chaletzky paid Sheehan and Connolly semi-annually, in $500 increments, so that they would remain his "friends" rather than become his "enemies." In return, Connolly gave Chaletzky his home telephone number and the telephone number for the detectives' room at the precinct house. He promised that he and Sheehan would hold themselves available to "help" with license violations and would deal with the authorities on Chaletzky's behalf.
 
 
 12
 2. Series B. Five defendants (Boylan, Carey, Kilroe, McCormick, and Nave) received money from Joseph McGowan, a co-owner of the 1270, during the period 1983-85. The amounts ranged from $200 to $600 per payment. In return, the detectives forewarned McGowan of inspections, assisted him by "fixing" citations, and interceded with Board personnel to sidetrack adversary proceedings. The interventions appear to have been effective: during the relevant period, there were no disciplinary hearings involving the 1270 despite numerous reports of serious violations occurring there.
 
 
 13
 3. Series C and D. These counts involved Thomas Moloney, owner of Frank 'N SteinsS and Play It Again Sam's (PIAS), and co-owner, with Warren Frank, of Patrick Brady's Grand Back Bay Pub and Grill (Brady's). From 1980 to 1986, Moloney made periodic payments of $200 to $300 to Kilroe and the defendant who happened to be Kilroe's partner at the time. In December 1984, Frank also paid Kilroe $200. Kilroe gave Moloney the telephone number to the detectives' room, offered escort services, tried to exert influence when a citation for overcrowding was issued to PIAS, and prompted an unusually celeritous police response when an untoward incident occurred at FNS. Kilroe volunteered escort services to Frank and gave him a business card on which McCormick's name was written.
 
 
 14
 4. Series F. The Blacke brothers, George and Lawrence, operated Nine Lansdowne. They made frequent payments to Nave and Sheehan in the 1984-86 time frame. The detectives gave the brothers their home telephone numbers and assisted them in divers ways: for example, the officers "straightened out" a patron who had frightened the Blackes; on another occasion, they resolved a dispute which arose out of a fight in the club. Nave and Sheehan would pick up George Blacke in their police cruiser, ask if he "needed anything" and if "everything was okay;" Blacke would then pay them $100 apiece "to stay in good." The Blackes made other payments to Nave, Sheehan, Boylan, and Kilroe.
 
 
 15
 5. Series H. Connolly rendered unauthorized escort services to John Moriarty, the manager of the Cafe Budapest. Connolly did the honors personally for the most part, often in a police car. Sheehan frequently accompanied him. In return, Connolly received free meals and drinks for himself, his family and friends. He also accepted interest-free loans.
 
 
 16
 6. Series I. Jean Tasse, an employee of a corporation which operated two nightclubs (Metro and Spit), paid Boylan, Connolly, Nave, and Sheehan in excess of the established rates for police details and made other cash payments to them. To reciprocate, Nave, Sheehan, and Boylan came to the corporation's assistance when it was cited for violations.
 
 
 17
 7. Series J. United Liquors (UL), a wholesaler, owned a billboard overlooking Fenway Park. Baseball fans, eager to avoid mounting ticket prices, often mounted the billboard instead to watch Boston Red Sox games in a cost-effective manner. Mary Fortier, a UL employee, called Sheehan in 1983 to arrange a security detail to ward off sign-perchers. Sheehan did not process the request through proper channels. Rather, he supplied Fortier with the names of policemen whom he said had performed the work and stipulated amounts to be paid to each. Following Sheehan's instructions, Fortier mailed checks to Sheehan's address for him to distribute to the designated police officers. The list, however, was bogus. Except for checks written to Nave (which Nave negotiated) and one check to Boylan, see infra note 5, Sheehan forged the payees' signatures and kept the money. This practice continued through 1985; 96 checks, totalling some $14,000, were transmitted. Neither Nave nor Sheehan reported the income for tax purposes.
 
 
 18
 At the expense of some repetition, we also scrutinize the evidence from a slightly different coign of vantage, taking the defendants one by one, in alphabetical order.
 
 
 19
 1. Boylan. The evidence showed that from 1984 through 1986 Boylan helped Carey and Kilroe "fix" numerous citations against the 1270 by intervening with line officers. A good illustration concerns a 1984 citation stemming from the alleged rape of a minor at the 1270. Boylan, Carey, and Kilroe reported periodically to McGowan on their efforts to influence members of the Board and shelve the citation. At Christmas that year, Boylan's payment from the 1270 was picked up by Carey (who collected payments for a number of the defendants). The citation eventually came to naught.
 
 
 20
 In 1983-85, Boylan was one of several officers (including Nave, Sheehan, and Connolly) to whom Tasse paid $900 annually. Boylan contacted Nave and Sheehan for Tasse when Tasse could not do so directly. The trio teamed to cover up violations. According to Tasse's testimony, Boylan collected money not only for himself, but on occasion for Nave, Sheehan, and other defendants. Boylan also accepted other payments, e.g., $200 from Frank (who had given the money to Kilroe to split with Boylan) and $200 from Lawrence Blacke (also via Kilroe).
 
 
 21
 2. Carey. Carey was introduced to McGowan by Sheehan. Carey, Boylan, and Kilroe visited McGowan at the 1270 in 1984. Carey told him that they had come to be "taken care of." After receiving $300 each, Carey told McGowan to call if he had any "problems." Carey returned to the 1270 later that summer to pick up money for another detective. He told McGowan to let him know whenever McGowan wanted to have an after hours party. In November, Carey worked with Kilroe and Boylan to prevent prosecution of the rape citation described earlier. McGowan gave Carey $600 to be divided between the officer who wrote the citation and a Board employee.
 
 
 22
 Tape recorded conversations revealed that in the fall of 1984 Carey received $1400 from McGowan for himself, McCormick, Boylan, Kilroe, and a fifth person. Carey stated that McCormick asked him to make the collection. He acknowledged that another officer had been paid off and that McCormick was involved. Carey told McGowan that he and his cohorts "can assist you like we have in the past," and warned McGowan against attempting to bribe a particular (honest) deputy. Carey also told McGowan about a time when he, Boylan, and Kilroe were miffed because they thought they had been shortchanged in a payoff.
 
 
 23
 The record shows that Carey gave tit for tat. A typical example of illicit assistance occurred in 1985. In respect to an overcrowding violation, Carey told McGowan that court proceedings would be pretermitted and that "we'll take care of the Board." His prediction proved prophetic: neither a court action nor a Board hearing eventuated. Carey and Kilroe later explained to McGowan how they ensured that the complaint would not be prosecuted. In 1985 and 1986, Carey, Boylan, and Kilroe derailed other charges by intervening with the detectives who issued the citations. When Carey was transferred in June 1985, he advised McGowan that another detective would continue to "take care of" the 1270 and that McGowan could pay for the service through Carey.
 
 
 24
 3. Connolly. Chaletzky was introduced to Connolly and Sheehan in 1979. The detectives told him that they "oversaw" the clubs in District 4 and that if Chaletzky had any problems with the police he should contact them. In exchange, Connolly and Sheehan were each to receive $500 at Christmas and at vacation time. Connolly picked up the money twice a year at Chaletzky's office, sometimes accompanied by Sheehan. Sheehan also received $150 or $200 from Chaletzky through Connolly for Sheehan's efforts in respect to a homicide investigation involving 88 Queensbury. Connolly asked for extra money after he expedited a gun permit that Chaletzky wanted.
 
 
 25
 McGowan testified that Connolly and Sheehan came to the 1270 one night and told him he was "in trouble" for overcrowding and serving a minor. After being informed that the 1270 was part of Chaletzky's family of clubs, the pair never issued a citation. When Connolly was transferred, he told Chaletzky he could still "help" if there were any "problems" and passed along his new telephone number.
 
 
 26
 As already recounted, Connolly, via Nave, received several payments from Metro and Spit. And, he accepted free meals, beverages, and loans from Cafe Budapest in return for escort services and the like.
 
 
 27
 4. Kilroe. In December 1983, Kilroe became McCormick's partner (replacing Nave). They took money from McGowan. Kilroe was also involved with Carey and Boylan in quashing the rape citation against the 1270. During February 1985, Chaletzky gave Kilroe $100 to take care of an overcrowding violation. Beginning around then, Kilroe and Boylan performed a series of mock inspections for the benefit of the 1270.
 
 
 28
 From 1979 to 1986 Kilroe picked up $400-$600 annually from Moloney. Boylan and McCormick were likewise implicated. On one occasion, Kilroe and Boylan were reprimanded after attempting to influence a police officer who had reported an overcrowding incident at PIAS. Moloney told Frank that Kilroe and his partners were the only police they could count on and that he (Moloney) paid them every Christmas. Kilroe also received $400 for himself and Boylan from the Blackes after Nave suggested that such a payment was in order. In 1985, Kilroe and Boylan took George Blacke for a ride in their police car and told him they would "work with" him if there were ever a "problem." Once Kilroe scared off a disgruntled patron who had threatened Blacke; Blacke gave Kilroe $400. Boylan acknowledged receiving half of the payoff.
 
 
 29
 5. McCormick. McCormick wrote a citation against the 1270 and the Board scheduled a hearing in September 1982. Sheehan told McGowan not to worry because the hearing was "all set." Sheehan was right. McGowan paid McCormick and Nave in January 1983. Later in 1983, after Kilroe became McCormick's partner, they collected money from McGowan. McCormick reminded McGowan to call if he had "any trouble." He informed McGowan that Nave was now Sheehan's partner and would henceforth take care of his own payments. McCormick also stated that Chaletzky (whom he regarded as McGowan's boss) was "paying off" Sheehan. In 1984, McCormick sent Carey to pick up the detectives' "vacation money" from McGowan (including money for McCormick). In March 1985, McCormick told McGowan that an overcrowding citation had been deep-sixed. And as mentioned earlier, Kilroe received cash from Moloney and split it with McCormick.
 
 
 30
 6. Nave. Nave's dealings vis-a-vis McGowan have already been chronicled and do not bear repetition. We add two lagniappes: (1) Nave did not allow Carey to retrieve his cut from McGowan. He did so himself, stating that he did not want "Carey and them picking mine up." (2) Nave also met McGowan at court and made inquiries on his behalf concerning matters which might be pending against the 1270.
 
 
 31
 The Blackes paid money to both Nave and Sheehan. In 1985-86, George Blacke paid them $100 apiece every other month "to stay in good with them and to be able to call them if I needed them." The Blackes also began paying Kilroe and Boylan at Nave's suggestion. Nave and Sheehan responded promptly whenever the Blackes sought their help.
 
 
 32
 Nave also collected money from Tasse for himself and other officers (including Boylan, Connolly, and Sheehan). In exchange, the detectives gave special attention to Tasse's businesses. If one of his bars was cited, Tasse would call Nave or Sheehan.
 
 
 33
 7. Sheehan. Sheehan was involved with Connolly in protecting Chaletzky's clubs and often accompanied Connolly when money changed hands. It was Sheehan who introduced McGowan to Nave. Sheehan spoke with a Board member about a case against McGowan while it was pending; later, accompanied by Nave, he told McGowan: "Don't worry, it's all set." The 1270 received only a wrist slap; its license was not suspended.
 
 
 34
 Sheehan had a plethora of other connections to the operation. He and Nave participated together in dealings with the Blackes; both were in the group which took money from Tasse; and Sheehan aided Connolly in furnishing escort services to Cafe Budapest.
 
 
 35
 Having done little more than scratch the tip of a fair-sized iceberg,[2] we limn the legal parameters of our inquiry. In order to convict a defendant for a RICO conspiracy, the government must prove:
 
 
 36
 (1) the existence of an 'enterprise,' (2) that the defendant knowingly joined the enterprise and (3) that the defendant agreed to commit, or in fact committed, two or more specified predicate crimes as part of his participation in the affairs of the enterprise.
 
 
 37
 United States v. Torres Lopez, 851 F.2d 520, 528 (1st Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1144, 103 L.Ed.2d 204 (1989); see also United States v. Angiulo, 847 F.2d 956, 964 (1st Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 314, 102 L.Ed.2d 332 (1988). In this case, the existence of an "enterprise" as that term is used in the RICO statutes is not open to serious question. Cf., e.g., Carroll v. Capalbo, 563 F.Supp. 1053, 1058 (D.R.I.1983) ("if it walks like a duck, and it squawks like a duck, it must be a duck"). And, if the evidence was sufficient to show a master conspiracy and defendants' union therein, the third furculum of the test was plainly achieved. Our inquiry thus reduces to whether such a conspiracy, knowingly joined by all defendants, was satisfactorily proven.
 
 
 38
 Factors to be considered in deciding whether one, or many, conspiracies were demonstrated include the nature, design, implementation, and logistics of the illegal activity; the participants' modus operandi; the relevant geography; and the scope of coconspirator involvement. See United States v. Rivera-Santiago, 872 F.2d 1073, 1079 (1st Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 3227, 106 L.Ed.2d 576 (1989); United States v. Drougas, 748 F.2d 8, 17 (1st Cir.1984). The conspiratorial agreement need not be express so long as its existence can plausibly be inferred from the defendants' words and actions and the interdependence of activities and persons involved. United States v. Glenn, 828 F.2d 855, 857 (1st Cir.1987); United States v. Flaherty, 668 F.2d 566, 580 (1st Cir.1981). What counts is whether it can be said, on the totality of the evidence, that "all of the alleged coconspirators directed their efforts towards the accomplishment of a common goal or overall plan," Drougas, 748 F.2d at 17; Flaherty, 668 F.2d at 580, agreeing in the bargain to participate in the enterprise's affairs through the commission of at least two predicate crimes.
 
 
 39
 To be guilty, colloguers need not be joined at the chest like Chang and Eng. A RICO conspiracy does not demand total fusion or that all defendants participate in all racketeering acts, know of the entire conspiratorial sweep, or be acquainted with all other defendants. See United States v. Stratton, 649 F.2d 1066, 1074 (5th Cir.1981); United States v. DePeri, 778 F.2d 963, 975 (3d Cir.1985), cert. denied, 475 U.S. 1110, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986). "The fact that every defendant did not participate in every transaction necessary to fulfill the aim of their agreement does not transform a continuing plan into multiple conspiracies." Drougas, 748 F.2d at 17; see also United States v. Garcia-Rosa, 876 F.2d 209, 223 (1st Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 742, 107 L.Ed.2d 760 (1990). Nevertheless, the component parts must be linked together in such a way as to afford a plausible basis for the inference that an agreement existed.
 
 
 40
 The evidence, we think, was more than ample to meet the applicable standard and tie the specified racketeering acts together. The prosecution may, of course, "prove its case through the use of circumstantial evidence so long as the total evidence, including reasonable inferences, is sufficient to warrant a jury to conclude that the defendant is guilty beyond a reasonable doubt." United States v. Campa, 679 F.2d 1006, 1010 (1st Cir.1982). Here, the similarities among the defendants and their activities were nothing short of striking: each defendant was a detective assigned to work nights in District 4 at some time during the indictment period; each received things of value, usually cash, from restaurant or nightclub owners in exchange for services not officially sanctioned; the targeted establishments were all in District 4 and all under the Board's aegis. The services themselves bore hallmarks of similarity. Moreover, there was a significant degree of interconnectedness. The defendants often cooperated with one another in collecting payments and in providing their specialized services. These common characteristics are precisely the kind of factors which can permissibly lead to the inference of a single conspiracy. See Rivera-Santiago, 872 F.2d at 1079; Drougas, 748 F.2d at 17. In a nutshell, the scenario portrays an association with far more than one "common thread" among the defendants. See Stratton, 649 F.2d at 1073 n. 8.
 
 
 41
 By the same token, we think that the proof of each defendant's complicity was convincing. Indeed, if the prosecution's version is accepted, there is little question that each defendant was extensively involved in a shared plan preying upon licensed premises, with every defendant participating in at least two predicate acts. The jury could well have concluded that the defendants (1) schemed to conduct the BPD's affairs through racketeering acts in pursuit of their mutual goal, and (2) were imbricated as a group, viewing themselves as interchangeable in important respects. One defendant, Carey, literally supervised five of the other defendants. Save only for Connolly, each of the defendants was directly connected by word and deed to all other defendants in the course of at least one racketeering act. And Connolly was sufficiently implicated: his intercourse with Boylan, Nave, and Sheehan in four of the Series I crimes, to cite one handy illustration, bespoke his complicity. As we have said, an accused's lack of direct connection with, or knowledge of, every racketeering act or series, does not preclude the inference of a single conspiracy; nor does it preclude the inference that a particular defendant was a champion of the master conspiracy. See Garcia-Rosa, 876 F.2d at 223; Drougas, 748 F.2d at 17.
 
 
 42
 To be sure, there was no proof of an express agreement. That is unsurprising: criminal conspiracies are by their nature clandestine. But an implied agreement can, and often does, suffice to ground a conspiracy charge. See, e.g., Glenn, 828 F.2d at 857-58. Here, a tacit accord was easily inferable. Defendants often spoke to their victims about other victims or other defendants in words which plainly revealed that the crimes were interdependent. The conspirators' success at one club helped to facilitate unlawful arrangements with other clubs. Some of the schemes were conjoined, while others were indirectly connected through common actors. Within the totality of the evidence, these facts unquestionably provided sufficient basis to infer that "all of the alleged coconspirators directed their efforts towards the accomplishment of a[n] ... overall plan." Drougas, 748 F.2d at 17.
 
 
 43
 In a criminal case, the jury's finding of guilt need not be inevitable. If the evidence, though susceptible to conflicting inferences, is adequate to permit a reasonable trier of fact to have found the essential elements of the charged crime beyond a reasonable doubt, a guilty verdict may appropriately be returned. See Torres Lopez, 851 F.2d at 527-58. This case falls comfortably within those familiar parameters: on the record as a whole, a rational jury could have found beyond reasonable doubt that an "enterprise" flourished; that a single master conspiracy overspread the serial sub-conspiracies; that each defendant knowingly and willfully joined in the illicit agreement to conduct the affairs of the enterprise (the BPD) through racketeering activity; and that each defendant perpetrated two or more predicate crimes in the course of the tawdry affair.
 
 
 44
 B. Jury Instructions: Conspiracy.
 
 
 45
 Appellants next assert that the district court's charge enfeebled their defense by glossing over the multiple conspiracy rule. We are unpersuaded.
 
 
 46
 The rule's underpinnings are firm. The criminal law does not permit responsibility to be founded on mere association. Guilt "is not a matter of mass application," but "remains individual and personal, even as respects conspiracies." Kotteakos v. United States, 328 U.S. 750, 772, 66 S.Ct. 1239, 1251, 90 L.Ed. 1557 (1946). The necessary and proper query relates to an individual defendant's involvement. A conspiracy trial, therefore, must probe "what kind of agreement or understanding existed as to each defendant." United States v. Borelli, 336 F.2d 376, 384 (2d Cir.1964), cert. denied, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). In this sense, RICO prosecutions are no exception. See United States v. Sutherland, 656 F.2d 1181, 1189, 1194 (5th Cir.1981), cert. denied, 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982). Hence, the multiple conspiracy rule is generically applicable in the RICO environment. Moreover, the question of whether a single or multiple conspiracy exists is ordinarily one of fact. Rivera-Santiago, 872 F.2d at 1079; Drougas, 748 F.2d at 17. If, on the evidence adduced at trial, a reasonable jury could find more than one such illicit agreement, or could find an agreement different from the one charged, a multiple conspiracy instruction is proper and should be given if requested. United States v. Dwyer, 843 F.2d 60, 61-62 (1st Cir.1988); United States v. Erwin, 793 F.2d 656, 662 (5th Cir.), cert. denied, 479 U.S. 991, 107 S.Ct. 589, 93 L.Ed.2d 590 (1986).
 
 
 47
 In this case, there were clearly multiple conspiracies: the indictment charged not only the omnibus RICO conspiracy involving all seven defendants, but six separate sub-conspiracies involving different groupings of defendants, see supra note 1. Recognizing as much, the district court purposed to cover the point in its instructions: "Should you find that any defendant participated in a conspiracy that was different from those charged in the indictment, that determination would be no basis for finding the defendant guilty of any of the offenses charged." Appellants complain that this reference suggested that the government was only precluded from proving conspiracies outside the scope of the indictment[3] and could have misled the jurors into convicting a defendant on the RICO count so long as he was found to have entered into any of the charged sub-conspiracies, regardless of whether the omnibus RICO conspiracy, or the particular defendant's participation therein, was proven.
 
 
 48
 We decline appellants' invitation to treat this single admonition in a vacuum. Read as a whole, the jury instructions were sensitive to defendants' rights. The court impressed upon the jury that each element of each charged offense had to be found beyond a reasonable doubt as to each defendant before a guilty verdict could be returned against that defendant. At the very outset of its formal instructions, the court asked the jury to "give separate consideration to each defendant and each charge," that is, to "consider each count and each defendant separately, considering the evidence as it bears against that defendant on that count in accordance with the instructions." The court repeatedly emphasized and reemphasized that the defendants were to be treated severally and individually in connection with each particular charge. As to the RICO conspiracy, the court framed the question as whether "the government carried its burden of proving each defendant guilty beyond a reasonable doubt of the charge listed," reminding the jury that the "essential elements are required to be proved beyond a reasonable doubt in order to establish the guilt of a particular defendant." And the jury was explicitly advised of its duty to determine whether the conspiracies existed "as charged."
 
 
 49
 Throughout the instructions, the court stressed that mere association or presence was insufficient to establish a given conspiracy. In instances too numerous to catalogue profitably here, the court made references to the defendants and the charges against them in singular form, focusing the jury's attention on "each defendant considered separately" according to "each charge." Time and again the court repeated that the government's burden was in no way lessened by the multiplicity of defendants and of charges. To say more would only paint the lily. We gauge each jury instruction in the context of the charge as a whole, not in isolation. See United States v. Serino, 835 F.2d 924, 930 (1st Cir.1987); United States v. Cintolo, 818 F.2d 980, 1003 (1st Cir.), cert. denied, 484 U.S. 913, 108 S.Ct. 259, 98 L.Ed.2d 216 (1987); see also Cupp v. Naughten, 414 U.S. 141, 146-47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). So viewed, we think the district court made it pellucid that only a conspiracy charged in a particular count of the indictment, and no other conspiracy, whether or not charged elsewhere in the bill, could properly bottom a conviction.
 
 
 50
 A trial judge has no obligation to use the precise language that a defendant prefers. Cintolo, 818 F.2d at 1004. Rather, "it is the judge's responsibility to ensure that the jury understands and appreciates the applicable law, and he is entitled to appreciable leeway in the manner of expression." United States v. Nazzaro, 889 F.2d 1158, 1167 (1st Cir.1989). We see nothing in the district court's aggregate instructions which could have confused the jurors, led them into error, or persuaded them to believe that a defendant should be found guilty of the RICO conspiracy--or any other charge for that matter--unless all essential elements of the particular offense had been proven. In the ensemble, the instructions provided ample safeguard that the conviction of one defendant on a particular charge would ensure neither the conviction of other defendants on that charge nor the conviction of the guilty defendant on any other count.
 
 IV. JOINDER AND SEVERANCE
 
 51
 Before trial, each defendant unsuccessfully moved for severance under Fed.R.Crim.P. 8(b) and 14.[4] They now argue that they were improperly joined in this single indictment and that the trial court abused its discretion in denying their motions to sever.
 
 
 52
 A. Joinder.
 
 
 53
 We begin with the unassailable: "The government is entitled to charge and join parties on the basis of what it reasonably anticipates proving against all." United States v. Martinez, 479 F.2d 824, 828 (1st Cir.1973). Nevertheless, mere similarity of acts, without more, does not justify joinder. United States v. Talavera, 668 F.2d 625, 629 (1st Cir.), cert. denied, 456 U.S. 978, 102 S.Ct. 2245, 72 L.Ed.2d 853 (1982); King v. United States, 355 F.2d 700, 703 (1st Cir.1966). A rational basis in fact, sufficient to warrant joinder, must be discernible from the face of the indictment. United States v. Arruda, 715 F.2d 671, 678 (1st Cir.1983). In this fashion, Rule 8(b) codifies a balanced compromise between a defendant's right to have his guilt considered separately and the systemic benefits of consolidated trials. See United States v. Luna, 585 F.2d 1, 4 (1st Cir.), cert. denied, 439 U.S. 852, 99 S.Ct. 160, 58 L.Ed.2d 157 (1978); Martinez, 479 F.2d at 828.
 
 
 54
 We need not pursue too closely the type of affiliating circumstances generally required for joinder since we have squarely held joinder to be proper where, as here, a single RICO count "embrace[s] all of the acts and transactions upon which the other ... counts [are] based." United States v. Tashjian, 660 F.2d 829, 833 (1st Cir.), cert. denied, 454 U.S. 1102, 102 S.Ct. 681, 70 L.Ed.2d 646 (1981); see also United States v. Davis, 707 F.2d 880, 883 (6th Cir.1983). So long as there is a responsible basis for the averments, charging an omnibus RICO conspiracy normally supplies the glue necessary to bond multiple defendants together in a single proceeding where all are accused of participating in the conspiracy. See United States v. Zannino, 895 F.2d 1, 16 (1st Cir.1990); see also Arruda, 715 F.2d at 678 (similar; non-RICO conspiracy).
 
 
 55
 This case exemplifies the general rule. The indictment charged each defendant with substantive RICO violations, with joining the overall RICO conspiracy, and with personally committing several predicate acts. The RICO charges embraced all the events upon which the other 56 counts were based. There was ample reason for shaping the indictment in this manner: similarities among the predicate acts--including their tight geographic and chronological setting and the coconspirators' common employment--suggested the existence of a joint criminal enterprise. The public benefit of a common trial was readily apparent. By and large, the racketeering acts and corresponding counts presented the requisite "sameness" to warrant joinder. Furthermore, the evidence presented at trial was ample to convict all defendants of the omnibus conspiracy. This is a good assurance that joinder was not a result of prosecutorial bad faith but was founded on a reasonable, good faith basis in fact. See Arruda, 715 F.2d at 678; Luna, 585 F.2d at 4. Even our admitted reservations about the UL counts, see infra Part V, weigh rather lightly in this balance. Decisions as to the propriety of joinder must be reviewed on the basis of what the prosecutor, exercising due diligence, knew (or sensibly believed) when the indictment was drawn. We think that, whatever conclusion a retrospective look may yield, the government, going into the case, had grounds for a reasonable anticipation that the UL scheme could be wedded to the other racketeering acts. Stringing the counts together was proper.B. Severance.
 
 
 56
 Deciding whether to grant or deny a severance is a matter committed to the trial court's sound discretion; we will interfere with the exercise of that discretion only upon a demonstration of manifest abuse. Arruda, 715 F.2d at 679; Talavera, 668 F.2d at 630. When severance has been refused, the burden is on appellants "to make a strong showing of prejudice" in order to gain a new trial. United States v. Porter, 764 F.2d 1, 12 (1st Cir.1985) (listing cases); see also United States v. Cresta, 825 F.2d 538, 554 (1st Cir.1987), cert. denied, 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988); Luna, 585 F.2d at 4; United States v. Smolar, 557 F.2d 13, 21 (1st Cir.), cert. denied, 434 U.S. 866, 98 S.Ct. 203, 54 L.Ed.2d 143 (1977). In this context, "prejudice means more than just a better chance of acquittal at a separate trial." Martinez, 479 F.2d at 828. This is a difficult battle for a defendant to win. There is always some prejudice in any trial where more than one offense or offender are tried together--but such "garden variety" prejudice, in and of itself, will not suffice. See Cresta, 825 F.2d at 554-55; United States v. Palow, 777 F.2d 52, 56 (1st Cir.1985), cert. denied, 475 U.S. 1052, 106 S.Ct. 1277, 89 L.Ed.2d 585 (1986); Tashjian, 660 F.2d at 834. Even where large amounts of testimony are irrelevant to one defendant, or where one defendant's involvement in an overall agreement is far less than the involvement of others, we have been reluctant to secondguess severance denials. See, e.g., Cresta, 825 F.2d at 554-55; Arruda, 715 F.2d at 679; Smolar, 557 F.2d at 21.
 
 
 57
 In the present case, of course, the same considerations which authorize joinder militate in favor of overruling defendants' Rule 14 claim. Moreover, we discern no unfair or unacceptable level of prejudice, that is, we see little beyond the type and degree of prejudice customary in virtually all high-profile trials of multiple defendants and charges. There is nothing to suggest that the number of defendants and charges was so large that the jury could not distinguish among them. See Luna, 585 F.2d at 5. The discriminating verdict itself (as respects counts 28 and 40) evidenced that the jurors were able to, and did, follow the court's instructions. See Cresta, 825 F.2d at 554-55; Tashjian, 660 F.2d at 834. Furthermore, as we describe more particularly infra Part V(B), the trial judge took effective measures to prevent any significant spillover from materializing. There were appropriate limiting instructions as to the admissibility of evidence against particular defendants and as to the need to determine guilt on an individual basis. All in all, this situation manifests the benefits of consolidated trials, with no corresponding drawbacks sufficient to necessitate severance. See Cresta, 825 F.2d at 555; Arruda, 715 F.2d at 678-79. There was no misuse of the district court's Rule 14 discretion.
 
 V. VARIANCE
 
 58
 Appellants assert with considerable fervor that there were material variances between the conspiracies charged and proven. We are fully satisfied, for reasons implicit in what we have already written, that no variance existed among the several bar/restaurant/nightclub protection schemes, on the one hand, and the charged RICO conspiracy, on the second hand. The only doubtful area concerns whether the UL crimes (Series J) were properly within the scope of the master conspiracy; and if not, whether transferred guilt (or "spillover") attributable to them led the jury to convict on the RICO charges.
 
 
 59
 A. Was There a Variance?
 
 Our analytic roadmap is well drawn:
 
 60
 [A]n appellate court, reviewing the type of alleged variance ... should ask the following questions. (1) Is the evidence sufficient to permit a jury to find the (express or tacit) agreement that the indictment charges? (2) If not, is it sufficient to permit a jury, under a proper set of instructions, to convict the defendant of a related, similar conspiracy? (3) If so, does the variance affect the defendant's substantial rights or does the difference between the charged conspiracy and the conspiracy proved amount to "harmless error?"
 
 
 61
 Glenn, 828 F.2d at 858; see also United States v. Thomas, 895 F.2d 51 at 55-57 (1st Cir.1990). In this case, the journey's first leg is humdrum; the evidence was unquestionably sufficient to permit a jury to find the RICO conspiracy. It was also sufficient, however, to permit the jury to find other, less encompassing conspiracies. Most pertinent for present purposes, we think that the UL crimes constituted a separate conspiracy and that the evidence did not allow a finding that they were within the master conspiracy's scope.
 
 
 62
 We start by stating the obvious: the UL plot, on its face, seems a breed apart from the other racketeering allegations mentioned in the indictment. For one thing, the illegal activity--defrauding a business by trick--was dissimilar in nature and kind to that involved in the bar/restaurant/nightclub schemes. The method of operation was foreign to the other schemes; rather than being accomplished through a series of consensual payments resulting from extortion or improper favors, Series J involved the procurement of money through mail fraud, forgery, and misrepresentation. Such methodologic differences are important. See, e.g., Rivera-Santiago, 872 F.2d at 1079; Drougas, 748 F.2d at 17. The target was also dissimilar; UL, a wholesaler and importer, was not the operator of licensed premises open to the paying public. It was therefore not subject to the sort of street-level oversight and regulatory control that made the other businesses so vulnerable to corrupt enforcement and undeserved preferences. Preying upon UL required a different tack. This uniqueness had another relevant aspect: unlike the bar/restaurant/nightclub schemes, which fed upon one another, it seems doubtful that the UL "venture could have helped the [other] venture[s], or vice versa." See Glenn, 828 F.2d at 859. Then, too, the billboard caper was much more tightly circumscribed, known by far fewer defendants, and bereft of the interconnections so prevalent among the other series of racketeering acts. Only Nave and Sheehan were directly involved. There is precious little evidence to suggest that any of the other defendants approved of, joined, or shared Nave's and Sheehan's efforts to conduct BPD affairs through mail fraud.[5] Put bluntly, too few of the common threads which ran through the fabric of the other racketeering acts ensnarled the UL affair.
 
 
 63
 To be sure, criminal conspiracies come in a wide variety of sizes, shapes, and styles. Yet, a prosecutor cannot string disparate incidents together by strands of supposition and surmise and expect the tie to bind. In this instance, the government argues that all the defendants, in Series J and beyond, used their official positions illegally to gain things of value. That is so--but it cannot be enough. There must be more of a nexus than rough temporal and geographic identity and affiliation with the same governmental unit. Were the government's generality legally sufficient, the prosecution could enfold within the RICO conspiracy charge every other BPD officer who, for example, may have accepted gratuities for voiding parking tickets in District 4 during the same time frame. We cannot accept that the law would allow painting with so broad a brush, conglomerating a bewildering array of markedly dissimilar criminal acts as part of a single RICO conspiracy on so tenuous a connection as has been demonstrated here. The UL affair did not belong within the confines of the omnibus RICO conspiracy. To this extent, a variance existed.
 
 
 64
 B. Was There Prejudice?
 
 
 65
 At the bottom line, the finding that the UL scheme constituted a variance does not profit the appellants: we conclude that the variance did not impact any defendant's substantial rights and, thus, can be dismissed as harmless.[6] Variance requires reversal only where defendants demonstrate that the difference in proof somehow affected their "substantial rights" so that they were "significantly prejudiced." Glenn, 828 F.2d at 859-60; see also Thomas, 895 F.2d at 56-57; Drougas, 748 F.2d at 17; Flaherty, 668 F.2d at 582. In this instance, Nave and Sheehan were found guilty of other non-UL-related offenses simultaneously charged as predicate acts,[7] so there is no chance that they were found guilty of the RICO conspiracy solely on the basis of their involvement with UL. Moreover, by acquitting Nave and convicting Sheehan on count 40, and acquitting both on count 28, the jury showed its ability to discriminate between the individual defendants and among the charged offenses, thereby blunting any accusation of harmful spillover.
 
 
 66
 Slightly more troubling is the defendants' united protest that prejudice inured because UL evidence, admitted without limitation, tainted the jury's perception of the case. The defense premise is sound in the abstract: courts must be vigilant in guarding against transference of guilt from evidence incriminating a defendant involved in one conspiracy to other defendants involved in a different conspiracy. See United States v. Levine, 569 F.2d 1175, 1177 (1st Cir.1978). We agree wholeheartedly that spillover effects from a variance, if substantially deleterious, may demand reversal in an appropriate case. Flaherty, 668 F.2d at 582. In this case, however, the spillover caused no legally significant harm.
 
 
 67
 Inasmuch as joinder of the Series J counts with the remainder of the charges was proper, see supra Part IV(A), and because the district court carefully charged the jury to treat each count separately, Nave and Sheehan are hard pressed to complain about this kind of spillover. The other defendants' claims of prejudice rest on an even more ephemeral postulate: because the UL scheme was so repugnant and the government's proof of it so incontrovertible, these appellants say, they were prejudiced by admission of the evidence (even though it did not refer directly to them). The argument is vapid. The UL affair stemmed from nonperformance of a security detail which, if handled through official channels, could appropriately have been commissioned. The bar protection schemes involved thinly veiled threats endangering the continuing viability of the victims' business enterprises and livelihoods and also involved conduct impermissible under any circumstances. The latter were amply proven and seem far more reprehensible. Evidence of payroll-padding would not appear, realistically, to add much fuel to so torrid a fire.
 
 
 68
 The sockdolager is that the trial court's instructions provided ample prophylaxis. Notwithstanding the number of defendants, the evidence was presented in a well-structured, compartmentalized fashion that minimized the risk of spillover to particular defendants from evidence directed at others.[8] At every turn, the trial judge reminded the jury to treat each defendant and each charge separately. In these ways, the chance for harm--remote and speculative to begin with--was further reduced. The court's precautions supply considerable assurance that no unfair prejudice resulted from the variance. We see no basis for ordering a new trial.
 
 VI. CONTINUITY
 
 69
 Appellants assign error to the trial court's failure, during jury instructions, specifically to mention "continuity" as an element of proving racketeering activity. Alternatively, they urge that even if the court's instructions were adequate the evidence failed to demonstrate the requisite continuity between the alleged predicate acts.
 
 
 70
 A. Instructional Error: Continuity.
 
 
 71
 The Criminal Rules furnish our point of embarkation: "No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto ... stating distinctly the matter to which that party objects and the grounds of the objection." Fed.R.Crim.P. 30. Parties must "clearly object," Glenn, 828 F.2d at 862, and their objections must be phrased with sufficient particularity to alert the trial court to the grounds asserted, United States v. Kaplan, 832 F.2d 676, 682 (1st Cir.1987), cert. denied, 485 U.S. 907, 108 S.Ct. 1080, 99 L.Ed.2d 239 (1988); United States v. Harrigan, 586 F.2d 860, 864 (1st Cir.1978).
 
 
 72
 Appellants say they properly preserved continuity as a ground of appeal anent the charge. The record belies the claim. In the trial court, appellants' objections were aimed not at the requirement of continuity, but at the supposed need to prove multiple schemes as a prerequisite to mounting a RICO prosecution (an idea now thoroughly discredited).[9] Typical is the objection lodged during the post-charge bench conference:
 
 
 73
 I think that you only gave half of the pattern instruction. I think the other half is that if the racketeering acts are too closely related together, that they may be subparts of the same transaction and not separate racketeering acts. And I think the evidence has to show multiple episodes of racketeering activity and not merely repeated acts that carry out the same criminal conduct....
 
 
 74
 This objection, fairly viewed, directed the court's attention away from, instead of toward, continuity. Litigants cannot expect a judge, particularly at the tail end of a long and complex trial, to be clairvoyant. "[R]obes and gavels are the tools of a jurist's trade--not tea leaves or crystal balls." United States v. Ladd, 885 F.2d 954, 961 (1st Cir.1989). Because no defendant pointed the district court toward the issue in a manner which could reasonably be expected to have alerted the judge to the instructional error hawked on appeal, we review the charge only for "plain error." United States v. Griffin, 818 F.2d 97, 100 (1st Cir.), cert. denied, 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987).
 
 
 75
 The plain error hurdle is high. See, e.g., United States v. Hunnewell, 891 F.2d 955 at 956-57 (1st Cir.1989) (reviewing Supreme Court caselaw). The doctrine does not allow litigants to be relieved from the "ordinary backfires ... which may mar a trial record." Griffin, 818 F.2d at 100. In applying plain error jurisprudence to the judge's charge, "the question is not whether the trial court failed to isolate and cure a particular ailing instruction, but rather whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." United States v. Thomann, 609 F.2d 560, 565 (1st Cir.1979) (quoting Cupp v. Naughten, 414 U.S. at 147, 94 S.Ct. at 400). Appellants' claim succumbs when measured against so rigorous a standard. We explain briefly.
 
 
 76
 The language of RICO itself makes explicit the requirement of "a pattern of racketeering activity." 18 U.S.C. Sec. 1962(c). RICO's use of the word "pattern" is to be taken in its "ordinary meaning," that is, the predicate acts must "fall into an[ ] arrangement or order." H.J. Inc. v. Northwestern Bell Telephone Co., --- U.S. ----, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989). Such a pattern "requires at least two acts of racketeering activity." 18 U.S.C. Sec. 1961(5). This language means that something more than proof of two predicate acts is needed to prove that a pattern took shape. See H.J. Inc., 109 S.Ct. at 2900; Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985); Fleet Credit Corp. v. Sion, 893 F.2d 441 at 444 (1st Cir.1990); Roeder v. Alpha Indus., Inc., 814 F.2d 22, 30 (1st Cir.1987). The nature of the "more", however, remains somewhat obscure.
 
 
 77
 In the absence of any pat formula, the Court has instructed us to use a flexible approach toward the pattern requirement, "deriv[ing] from a common-sense, everyday understanding of RICO's language and Congress' gloss on it." H.J. Inc., 109 S.Ct. at 2901. The Court itself has focused on "relatedness" and "continuity" as useful tools in proving a pattern of racketeering activity. Id. at 2900. It is, therefore, "continuity plus relationship which combines to produce a pattern." Sedima, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14 (quoting S.Rep. No. 91-617 (1969)); see also Fleet Credit, at 444. It follows, of course, that continuity is not an element of a RICO offense, stricto senso, but it is nevertheless a necessary characteristic of the evidence used to prove the existence of a pattern.
 
 
 78
 Continuity may be demonstrated "in a variety of ways." H.J. Inc., 109 S.Ct. at 2901. In practice, proof of continuity may overlap with proof of relatedness, id. at 2900, but such an imbrication is not inevitable. Continuity--which can be defined as a showing that the racketeering predicates "amount to or pose a threat of continued criminal activity," id.--may be established "by proving a series of related predicates extending over a substantial period of time" or by proving that "the predicates are a regular way of ... conducting or participating in an ongoing and legitimate RICO 'enterprise,' " id. at 2902, or by proving that the predicates form a "closed period of repeated conduct," id. In any event, it is by now clear that temporality lies at the core of continuity. Id.; see also Fleet Credit, at 447 (allegation of fraudulent mailings over 4-year period satisfies continuity requirement).
 
 
 79
 Defendants are correct that the court below omitted the specific word "continuity" from its jury instructions. But the word itself should not be accorded talismanic significance. Despite the expurgation, the substance of the point was covered. To cite one specific example, the court stated:
 
 
 80
 [A]t least two racketeering acts are necessary ..., but proof of two separate racketeering acts does not necessarily constitute a pattern of racketeering activity. Proof of two is necessary, but that proof alone is not sufficient. Two of something does not constitute a pattern by itself. The two acts must be connected in some way. Criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not separated, isolated events.... You may find that two or more acts are part of a pattern, that even though they are different from each other, they are related to the affairs of the enterprise ... in such a way as to form a pattern of racketeering activity. Again, just finding two acts were committed is not enough. They must be in a pattern. They must form a pattern.
 
 
 81
 This instruction unarguably apprised the jury of the pattern requirement. At best, then, appellants' point reduces to a claim that the court misguggled the charge by failing satisfactorily to define this element of the offense. The claim will not wash.
 
 
 82
 The charge stressed that "something more" than two acts was necessary to prove a racketeering pattern and evoked that "something more" in commonsense terms consonant with the Court's teachings. The instruction succinctly recited types of "distinguishing characteristics" on which the jury could rely to show the requisite interrelationship. Cf. Fleet Credit, at 446. The characteristics mentioned by the lower court adequately evinced the concept that continuity requires "a series of related predicates extending over a substantial period of time," reflective of a "regular way" of conducting the enterprise's affairs. See H.J. Inc., 109 S.Ct. at 2902; see also Fleet Credit, at 446. Whether or not erroneous in the strictest sense, we are confident that any shortcomings in the charge did not affect defendants' substantial rights.
 
 
 83
 Other courts have held far less elaborate instructions on "pattern"--instructions which also omitted specific reference to "continuity"--are sturdy enough to withstand plain error review. See, e.g., United States v. Muskovsky, 863 F.2d 1319, 1328-29 (7th Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1345, 103 L.Ed.2d 813 (1989); United States v. Grayson, 795 F.2d 278, 288-90 (3d Cir.1986), cert. denied, 479 U.S. 1054, 107 S.Ct. 927, 93 L.Ed.2d 978 (1987).[10] We explain infra that, in this case as in Muskovsky, there could be no plain error because "the jury's finding of guilt on all of the predicate ... counts ... necessarily established the requisite continuity and relationship." 863 F.2d at 1329. In this case, as in Grayson, "the evidence was such that a jury finding [defendant] guilty of a RICO violation could only have relied upon predicate acts having the necessary interrelatedness." 795 F.2d at 290. In both Muskovsky, 863 F.2d at 1329, and Grayson, 795 F.2d at 290, as here, the lengthy time frame over which the predicate acts occurred, their common location, the similarities in the alleged conduct, the number of separate sub-schemes, the overlapping roles of the individuals involved, and their coordinated actions, combine to indicate that the required "continuity plus" was shown. See, e.g., Fleet Credit, at 445-447. There was no plain error.
 
 
 84
 B. Proof of a Pattern.
 
 
 85
 Appellants' argument that the evidence was insufficient to prove a pattern of racketeering activity need not occupy us for long. As in Muskovsky and Grayson, the requisite continuity is manifest among the predicate acts on which the jury must have relied to convict under RICO. The evidence demonstrates beyond peradventure that the racketeering acts were not isolated events. The jury concluded, supportably, that each defendant used his official position to profit through Hobbs Act offenses. These activities continued over lengthy periods of time (no less than a year in any instance and for as long as six years in certain instances). The number of acts and the presence of numerous subschemes lend great weight in the balance. See Fleet Credit, at 446. As to relatedness, the similarities among the predicate acts were obvious and do not bear repeating. In fine, the collocation of so many common characteristics along so lengthy a temporal span belied appellants' denials that these actions were not a regular way of conducting their BPD business.
 
 
 86
 We have often acknowledged that, in a criminal trial, the factfinder "is free to choose among various reasonable constructions of the evidence." United States v. Thornley, 707 F.2d 622, 625 (1st Cir.1983) (per curiam). The proof need not rule out reasonable alternative hypotheses of innocence so long as the record, in toto, viewed favorably to the government, substantiates a finding of guilt. See United States v. McHugh, 769 F.2d 860, 867 (1st Cir.1985). Based on the mass of assembled evidence in this case, the jury could certainly have found that defendants, as a group, participated in "a series of related predicates extending over a substantial period of time." H.J. Inc., 109 S.Ct. at 2902, and that defendants' serial schemes embraced "criminal acts that have the same or similar purposes, results, participants, victims, [and] methods of commission," id. at 2901. There was enough evidence of a "pattern" to support the convictions.
 
 VII. THE HOBBS ACT
 
 87
 Appellants fire several rounds of grapeshot at their Hobbs Act convictions. All have to do with perceived deficiencies in the lower court's instructions. Only two salvos warrant discussion.
 
 
 88
 A. Inducement.
 
 
 89
 The Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. Sec. 1951(b)(2). The courts of appeals are divided on the precise interpretation of this language. Penologically, the dispute centers upon whether the Hobbs Act preserves the distinction between bribery and extortion. Linguistically, the dispute centers upon the effect of the disjunctive immediately preceding the words "under color of official right." Some courts have decided that, given grammar and syntax, the "under color" phrase modifies the verb "induced," thus requiring the prosecution to show that a defendant not only acted "under color of official right" but also that he induced payment by some form of Hobbs Act extortion. See United States v. Aguon, 851 F.2d 1158, 1162-63 (9th Cir.1988) (en banc); United States v. O'Grady, 742 F.2d 682, 694 (2d Cir.1984) (en banc). Other courts have rejected this interpretation, ruling that inducement is not required if Hobbs Act extortion occurs "under color of official right." See, e.g., United States v. Holzer, 816 F.2d 304, 311 (7th Cir.1987), cert. denied, 484 U.S. 1076, 108 S.Ct. 1054, 98 L.Ed.2d 1016 (1988); United States v. Spitler, 800 F.2d 1267, 1274-75 (4th Cir.1986); United States v. Swift, 732 F.2d 878, 880 (11th Cir.1984), cert. denied, 469 U.S. 1158, 105 S.Ct. 905, 83 L.Ed.2d 920 (1985); United States v. Jannotti, 673 F.2d 578, 595 (3d Cir.) (en banc), cert. denied, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982).
 
 
 90
 In the past, we have successfully avoided this issue,[11] see United States v. Jarabek, 726 F.2d 889, 904 n. 16 (1st Cir.1984); see also United States v. Hathaway, 534 F.2d 386, 394 (1st Cir.), cert. denied, 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976), and do so again. We enjoy this luxury because the trial court's instructions in this case required the jury to find, as a condition precedent to guilt, that defendants induced the payments. In the court's words: "If there is no inducement, there is no crime." The court made numerous other statements to the effect that inducement was necessary to convict under the Hobbs Act. It also explained:
 
 
 91
 Inducement can take many forms, some more subtle than others, and any inducement is sufficient.... The mere passive receipt of a gift is not extortion. The government is not required to prove that the defendant demanded or directly solicited the payment made or that he offered anything specific in return for it.
 
 
 92
 The instructions continued at length, describing ways in which the government might prove inducement. Inasmuch as the court's charge tracked the language used by those circuits which impose an inducement requirement, see, e.g., Aguon, 851 F.2d at 1166 (" 'inducement' can be in the overt form of a 'demand,' or in a more subtle form"); O'Grady, 742 F.2d at 691 ("inducement can take many forms, some more subtle than others"); id. at 693 (prosecution must show defendant "did something" to induce payment), appellants have obtained the benefit of the rule in its most liberal permutation. Because the charge passed muster on any view of the statutory language, appellants' rights were amply protected.[12]B. Mens Rea.
 
 
 93
 Defendants claim that the district court's instruction on specific intent was inappropriate. Near the beginning of the charge, the judge stated:
 
 
 94
 The term "knowingly" means that the act was done voluntarily and intentionally, not because of mistake or accident. The word "willfully" means that the act was committed voluntarily and purposely with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law. These instructions will apply to these terms throughout the remainder of these instructions.
 
 
 95
 Thereafter, in enumerating the elements of Hobbs Act offenses, the court twice stated that the government had to prove that "defendant willfully and knowingly obtained property from the person."
 
 
 96
 No matter what type of extortion is alleged, specific intent is part and parcel of a Hobbs Act conviction. See, e.g., Aguon, 851 F.2d at 1168 (extortion under color of official right); United States v. Haimowitz, 725 F.2d 1561, 1572 (11th Cir.) (extortion through fear of economic loss), cert. denied, 469 U.S. 1072, 105 S.Ct. 563, 83 L.Ed.2d 504 (1984); see also United States v. Sturm, 870 F.2d 769, 777 (1st Cir.1989). In our opinion, the definitions employed by the court below adequately conveyed the essence of the mens rea requirement for Hobbs Act extortion. Compare, e.g., Aguon, 851 F.2d at 1168; United States v. Kattar, 840 F.2d 118, 124 n. 4 (1st Cir.1988); United States v. Dozier, 672 F.2d 531, 542 (5th Cir.), cert. denied, 459 U.S. 943, 103 S.Ct. 256, 74 L.Ed.2d 200 (1982); United States v. Scacchetti, 668 F.2d 643, 649 (2d Cir.), cert. denied, 457 U.S. 1132, 102 S.Ct. 2957, 73 L.Ed.2d 1349 (1982); cf. Sturm, 870 F.2d at 775 (rejecting "purely objective" definitions which contained "no reference to the defendant's state of mind"). Furthermore, the charge as a whole made it plain that the definitions applied across the board. There was no error.[13]
 
 
 97
 Appellants also denigrate the instruction on "under color" extortion from another standpoint. The charge suggested, appellants say, that a conviction could be based on a defendant's knowledge that the victim was motivated by the public office held rather than by some misuse of that office. But, this hairsplitting incorrectly shifts the mens rea focus to fine--and wholly needless--distinctions concerning what a defendant might think that a payor might be thinking. In extortion, "[t]he emphasis is on the defendant's own motives rather than on his perception of a potential contributor's motive." Dozier, 672 F.2d at 542. Telepathy aside, the crux of the matter is whether the official accepts the gratuity knowing that payment is being tendered because of his public office. In order to convict in an "under color" case, it is unnecessary to draw distinctions between payors who are galvanized by defendant's public office and those who are galvanized by some overt misuse of that office. See, e.g., Spitler, 800 F.2d at 1274-75; United States v. Blackwood, 768 F.2d 131, 137 (7th Cir.), cert. denied, 474 U.S. 1020, 106 S.Ct. 569, 88 L.Ed.2d 554 (1985); United States v. Butler, 618 F.2d 411, 418 (6th Cir.), cert. denied, 447 U.S. 927, 100 S.Ct. 3024, 65 L.Ed.2d 1121 (1980); cf. United States v. McKenna, 889 F.2d 1168, 1174 (1st Cir.1989) ("under color" language includes threats inherent in public office).
 
 
 98
 In a last gasp, as if the third time were the charm, appellants press a final mens rea objection. On the topic of extortion by fear of economic harm, the district court charged that "the exploitation of the payor's reasonable fear constituted extortion whether or not the defendant was responsible for creating that fear and despite the absence of any direct threats." Appellants speculate that the remark could have allowed the jury to convict them without proof that they were aware of, or intended to take advantage of, the victim's fear. But, this bit of unmitigated conjecture improperly wrests the court's comment from its contextual moorings. See McKenna, 889 F.2d at 1173 (reviewing instructions "in light of the whole charge and the whole trial, not singularly").
 
 
 99
 The disputed statement was made in a section of the instructions defining (and distinguishing) various types of Hobbs Act extortion. The court's emphasis was on the source of the fear which was being exploited, not on exploitation itself. Nothing in this preachment, or elsewhere in the charge, negated the need for the prosecution to prove intent to exploit. In addition, the court told the jurors that (1) a conviction would have to be based on exploitation of the payor's fear, and (2) a defendant must have "wrongfully used" that fear to induce the payor's consent. These instructions plainly implied that unintentional conduct would not suffice. See Scacchetti, 668 F.2d at 649 ("Use of power 'to obtain money' clearly refers to the purpose of the defendant."). Given the setting in which the challenged comment occurred and the court's general instruction that any Hobbs Act violation must entail willful and knowing conduct, we see no infirmity.
 
 VIII. CROSS-EXAMINATION
 
 100
 Before the grand jury, the Blacke brothers admitted bribing Jon Straight, a Board member, by means of cash gifts and procurement of male prostitutes. The Blackes' testimony was obtained through grants of immunity covering myriad prosecutable offenses, including their not-so-straight arrangements with Straight. The trial judge allowed inquiry into the bribery, but not into the recruitment of prostitutes or George Blacke's sexual orientation. Appellants assert that the limits placed on cross-examination abridged their sixth amendment rights and comprised an abuse of the district court's power. In expounding the point, they say that the restrictions prevented the jury from learning the full sweep of the immunity conferred; that the unedited story was relevant to show that the Blackes were veteran bribe-givers rather than hapless victims of extortion; and that the defense's efforts to shatter the Blackes' credibility were hamstrung.
 
 
 101
 The right to cross-examine adverse witnesses is constitutionally guaranteed. Davis v. Alaska, 415 U.S. 308, 315, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). The guarantee extends to the elicitation of information about the immunity granted to a witness in exchange for his testimony. United States v. Barrett, 766 F.2d 609, 614 (1st Cir.), cert. denied, 474 U.S. 923, 106 S.Ct. 258, 88 L.Ed.2d 264 (1985). Nevertheless, the right to cross-examine is not unfettered. See Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986); United States v. Chaudhry, 850 F.2d 851, 856 (1st Cir.1988). Defendants cannot run roughshod, doing precisely as they please simply because cross-examination is underway. So long as a reasonably complete picture of the witness' veracity, bias, and motivation is developed, the judge enjoys power and discretion to set appropriate boundaries. See Garcia-Rosa, 876 F.2d at 237; Griffin, 818 F.2d at 101. Indeed, the judge has a responsibility to do so.
 
 
 102
 To show a constitutional violation, a defendant must demonstrate that he was "prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." Van Arsdall, 475 U.S. at 680, 106 S.Ct. at 1436. Short of a constitutional infringement, appellate courts will grant relief from the shackling of cross-examination only for manifest abuse of discretion. Rivera-Santiago, 872 F.2d at 1084. Having carefully combed the record, we discern no valid cause for complaint.
 
 
 103
 Many of the bars involved in this case catered primarily, or at least frequently, to homosexual persons. Some of the witnesses shared that persuasion. Both before and during trial, the court expressed a desire not to becloud the charges by trying the case "in a homosexual sense." After warning defense counsel away from the topic during opening statements, the judge consistently blocked questions aimed at bringing the matter of sexual orientation to the forefront.[14] Given the marginal value of sexual preference testimony and its potential to distract the jury from the legitimate issues in the case, we think that the court's plan was a wise and proper exercise of its authority.
 
 
 104
 What is most important, the circumscription created no cognizable unfairness. The court never prohibited defendants from asking about the money given to Straight or the fact that he was bribed on several occasions. Straight's venality, the Blackes' corrupt intentions, and other material aspects of the relationship between the Blackes and the Board member were fully explored. Only the sex-related trimmings were placed off limits. In the court's words: "Male prostitution, homosexuality, personal sexual inclination, no. Inquiry about a relationship or established relationship with Jon Straight which allowed him to use Jon Straight to influence actions on the Board to benefit himself, yes." And in the end, the cross-examination of both George and Lawrence Blacke proved thorough, probing, and wide-ranging. They were questioned intensively and extensively about their understanding of the immunity orders. George Blacke was asked about much of the activity for which he was given immunity, including cocaine use. Lawrence was queried about payments for police details, alleged cocaine purchases, and schemes to bribe officials.
 
 
 105
 This cross-questioning was constitutionally sufficient. The Blackes' understanding of their immunity, the numerous crimes which were shielded, and the bribery itself were the essential factors shedding light on the witnesses' testimonial incentives and veracity. All were covered in excruciating detail. The jury heard more than enough to form a complete and accurate picture of the breadth of the immunity, the Blackes' potential motivations, and their likely prejudices. The defense was allowed to "fully establish[ ] the potential bias" of the witnesses. Barrett, 766 F.2d at 614. Here, as in United States v. Tracey, 675 F.2d 433, 439 (1st Cir.1982), "the jury was in possession of evidence sufficient to permit it to make a discriminating appraisal of [the witnesses'] motives to testify." The confrontation clause requires no more.
 
 
 106
 It is equally clear that the judge did not abuse his discretion. In the context of the picture which defense counsel were allowed to paint, the incremental probative value of presenting evidence anent George Blacke's sexual orientation was zero; the incremental value of the evidence as to male prostitutes was either slim or none. The evidence had a far greater potential to obscure than to enlighten. Bearing in mind the wide latitude afforded trial judges under Fed.R.Evid. 403, see, e.g., U.S. v. Zannino, 895 F.2d 1 at 16 (1st Cir.1990); Tierney, 60 F.2d at 387-88, the district court's conclusion that the inflammatory and prejudicial effects of the forbidden subjects substantially outweighed any relevance or probative effect is not open to serious question. The limitations placed on cross-examination appear altogether appropriate.
 
 IX. THE PERSONNEL FILES
 
 107
 At trial, the district court permitted the prosecution to introduce "personnel orders" taken from BPD files. These documents contained historical information about defendants' placements within the department, e.g., promotions, status changes, reassignments. The personnel orders were part of regularly maintained personnel files. The files also held documents relating, inter alia, to commendations, suspensions, punishments, outside studies, and the like. Appellants claim that the court's refusal to let them introduce the unexpurgated files constituted prejudicial error. We examine their contention.
 
 
 108
 The court initially rejected defendants' proffer as non-pertinent character evidence. See Fed.R.Evid. 404(a)(1). Defendants argue that the ruling took too myopic a view; they claim that the excluded documents were relevant to allow a balanced portrayal of their overall relationship, good and bad, to the enterprise. The inquiry presented in a RICO trial, however, focuses not on the contours of the relationship between defendants and enterprise (contours largely undisputed here), but on the relationship of the predicate acts to each other and to the enterprise. See Yellow Bus Lines, Inc. v. Local Union 639, 839 F.2d 782, 792-94 (D.C.Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 309, 102 L.Ed.2d 328 (1988); see also United States v. Welch, 656 F.2d 1039, 1060-62 (5th Cir.1981), cert. denied, 456 U.S. 915, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982); United States v. Scotto, 641 F.2d 47, 54 (2d Cir.1980), cert. denied, 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981). Placed in proper perspective, then, defendants' lament collapses of its own weight. Evidence of their hard work and dedication would be no more than marginally relevant to any disputed issue in this case. Bearing in mind the leeway that a trial judge possesses in admitting or excluding evidence on grounds of relevance, see Tierney, 760 F.2d at 387-88; Drougas, 748 F.2d at 24, exclusion of the evidence cannot productively be assigned as error.
 
 
 109
 Next, appellants claim that a misleading impression was created by presenting the personnel orders and not the remainder of the files. This claim hinges on Fed.R.Evid. 106, a stricture which protects litigants from the twin pitfalls of creative excerpting and manipulative timing.[15] "The rule is based on two considerations. The first is the misleading impression created by taking matters out of context. The second is the inadequacy of repair work when delayed to a point later in the trial." Fed.R.Evid. 106, reporter's notes; see also Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 109 S.Ct. 439, 451 n. 14, 102 L.Ed.2d 445 (1988). Here, the court did not merely delay admission of the remainder of the files, but scrapped them altogether. Accordingly, our concern lies with the first of the considerations undergirding the rule.
 
 
 110
 It is perfectly clear that the threshold question under Rule 106 is always one of defining the entirety: that is, if Rule 106 applies, what is it that must be complete? Because the doctrine of completeness embodied in Rule 106 neither mandates nor delineates a particular strata of entirety, but instead looks to "fairness" to determine which things should be "considered contemporaneously with" each other, we believe that a practical, commonsense approach must be taken in answering the definitional question. The result, essentially, becomes a line-drawing exercise, to be conducted case by case. Inasmuch as each document, or set of documents, tends to be sui generis, a mechanical taxonomy seems unworkable.
 
 
 111
 Typically, it is easy to frame the dimensions of the entirety. The usual problem concerns an excerpt from a single document which neglects some revealing context of the whole. See, e.g., United States v. Poschwatta, 829 F.2d 1477, 1483 (9th Cir.1987), cert. denied, 484 U.S. 1064, 108 S.Ct. 1024, 98 L.Ed.2d 989 (1988). That is not our case. The personnel orders were complete in and of themselves. We see no valid basis for a per se rule that all documents contained in agglomerated files must be admitted into evidence merely because they happen to be physically stored in the same folder. Cf., e.g., United States v. Smith, 794 F.2d 1333, 1335 (8th Cir.) (additions must be explanatory and relevant to admitted portions), cert. denied, 479 U.S. 938, 107 S.Ct. 419, 93 L.Ed.2d 370 (1986); United States v. Marin, 669 F.2d 73, 84 (2d Cir.1982) (similar); United States v. Walker, 652 F.2d 708, 710 (7th Cir.1981) (similar). Rather, in determining the admissibility of various units contained in document collections, a preliminary decision must be made as to what grouping constitutes a fair and reasonably complete unit of material. In some cases, that unit may be a single document; in others, all the documents; or in a third class, some subpart of a document or collection. See United States v. Dorrell, 758 F.2d 427, 435 (9th Cir.1985) (admission of redaction of written confession not required where separate, removed portion has no bearing on relevant facts); Brewer v. Jeep Corp., 724 F.2d 653, 657 (8th Cir.1983) (no abuse in refusal to admit film without companion written report); Finn v. United States, 219 F.2d 894, 901 (9th Cir.) (removal of one document from sheaf not prejudicial), cert. denied, 349 U.S. 906, 75 S.Ct. 583, 99 L.Ed. 1242 (1955). We believe that the only sound approach is to accord the district court, within its usual evidentiary discretion, the task of determining what reasonable unit of wholeness must be preserved in order to comply with Rule 106's mandate of completeness.
 
 
 112
 In the case at bar, all of the personnel orders were admitted without editing. All were independently admissible as records "kept in the course of a regularly conducted business activity" and as part of the BPD's "regular practice." Fed.R.Evid. 803(6). Without exception, the orders are simple and unambiguous statements of historical fact. They were introduced in order to place the defendants together with their partners within the district where the victims operated their businesses during the period when the charged crimes occurred. As such, they also corroborated the testimony of witnesses who said they made certain payments to certain defendants at certain times.
 
 
 113
 The documents which defendants claim they were entitled to introduce were, to the contrary, a hodgepodge of anecdotal items. The files held a wide array of miscellany not inherently related to any litigated issue. Appellants do not indicate how, if at all, the diaspora of information contained in the files bore on the merits of the case, contradicted the timing and placement manifested by the admitted documents, or was necessary to explain the orders. Moreover, the lower court never prohibited the defense from offering specific documents on particular points. Seen in this light, it is hard to fault the rejection of defendants' grab-bag approach to the admissibility of documentary evidence. The court's decision to admit only the personnel orders, and not unexpurgated files, was not an abuse of its broad discretion.[16]
 
 X. JURY MISCONDUCT
 
 114
 Three days after the jury verdicts were returned, a juror (Payne) contacted Nave's attorney complaining that the jury had been predisposed to find the defendants guilty. Counsel notified the judge, who met with the attorneys of record and thereafter interviewed Payne in the lawyers' presence. At that time, the juror not only reiterated his concerns about predisposition but stated that, during the trial, a questionable magazine article had circulated in the jury room.[17] Following further discussions with counsel, the judge interviewed the remaining jurors and alternates. Upon completion of that process, defendants moved for a new trial by reason of jury misconduct. The district court, in a meticulously detailed opinion, denied the motions, United States v. Boylan, 698 F.Supp. 376 (D.Mass.1988), concluding that the "case was fairly and impartially considered by a fair and impartial jury." Id. at 393.
 
 
 115
 Appellants attack the court's ruling on several fronts, contending inter alia that the inquiry was inadequate; that the judge applied the wrong legal standard in evaluating taint; and that he impermissibly considered the jurors' subjective mental processes. We begin by assessing the nature and extent of the inquiry. Finding, as we do, that the court's methodology was sound, we then proceed to the merits of the disputed ruling.
 
 
 116
 A. Nature of the Inquiry.
 
 
 117
 When a colorable claim of jury misconduct surfaces, the district court has broad discretion to determine the type of investigation which must be mounted. Hunnewell, 891 F.2d at 961; Nazzaro, 889 F.2d at 1167; United States v. Anello, 765 F.2d 253, 259 (1st Cir.), cert. denied, 474 U.S. 996, 106 S.Ct. 411, 88 L.Ed.2d 361 (1985); United States v. Almonte, 594 F.2d 261, 266 (1st Cir.1979); United States v. Corbin, 590 F.2d 398, 400 (1st Cir.1979). The trial judge may, but need not, convene a fullblown evidentiary hearing. See, e.g., Smith v. Phillips, 455 U.S. 209, 216-18, 102 S.Ct. 940, 945-47, 71 L.Ed.2d 78 (1982); Remmer v. United States, 347 U.S. 227, 229-30, 74 S.Ct. 450, 451-52, 98 L.Ed. 654 (1954) (Remmer I ); United States v. Butler, 822 F.2d 1191, 1196 (D.C.Cir.1987). Rather, his primary obligation is to fashion a responsible procedure for ascertaining whether misconduct actually occurred and if so, whether it was prejudicial. See Hunnewell, 891 F.2d at 961; United States v. Williams, 809 F.2d 75, 85 (1st Cir.1986), cert. denied, 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 377 (1987); Corbin, 590 F.2d at 400.
 
 
 118
 We abjure imposition of a rigid set of rules for the conduct of inquiries into the presence or extent of extrinsic influences. For one thing, the kaleidoscopic variety of possible problems counsels in favor of flexibility. For another thing, jurors should not be subjected to undue impositions. Thus, the scope of such an inquiry "should be limited to only what is absolutely necessary to determine the facts with precision." United States v. Ianniello, 866 F.2d 540, 544 (2d Cir.1989). So long as the district judge erects, and employs, a suitable framework for investigating the allegation and gauging its effects, and thereafter spells out his findings with adequate specificity to permit informed appellate review, see United States v. Doe, 513 F.2d 709, 711-12 (1st Cir.1975), his "determination that the jury has not been soured deserves great respect [and] ... should not be disturbed in the absence of a patent abuse of discretion." Hunnewell, 891 F.2d at 961; see also United States v. Angiulo, 897 F.2d 1169, 1185 (1st Cir.1990).
 
 
 119
 In this case, the mechanics of the probe are described in detail in the district court's rescript, see Boylan, 698 F.Supp. at 377, 380-83, and do not bear repeating. It suffices to say that the inquiry was commensurate to the gravity of the charge and the seriousness of the task: patient, careful, searching, thorough, methodologically sound. From the start, the court and counsel engaged in an ongoing dialogue regarding both procedure and substance. All jurors and alternates were interviewed individually. All counsel were present (or afforded the opportunity to be present) throughout the interrogation. Although the court refused to allow direct attorney participation in the questioning, the lawyers were not shut out of the process. On at least six occasions, defense counsel suggested supplementary questions which were then put to jurors.
 
 
 120
 The decision not to conduct a more rigidly structured evidentiary hearing was well within the district court's discretion. Apart from the jury, there were no other witnesses to be examined. It is highly improbable that significantly different or more detailed information would have been elicited if the jurors testified under oath or were subjected to cross-examination. We think there was likely too little to be gained to insist, as a matter of law, that the court in such a situation convene a fullblown evidentiary hearing. And as a matter of discretion, we are loath to tinker with the presider's on-the-spot judgment.
 
 
 121
 In sum, the probe conducted here met, and surpassed, the benchmarks suggested by our earlier cases. See, e.g., Hunnewell, 891 F.2d at 961; Neron v. Tierney, 841 F.2d 1197, 1202 (1st Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 90, 102 L.Ed.2d 66 (1988); Tavares v. Holbrook, 779 F.2d 1, 2-3 (1st Cir.1985); Anello, 765 F.2d at 258-59. The contention that the district court's inquiry was inadequate is without merit.
 
 
 122
 B. Results of the Inquiry.
 
 
 123
 Defendants' remaining assignments of error challenge in one way or another the validity of the district court's conclusion that the claimed "jury misconduct" did not warrant a new trial. The challenge is essentially trichotomous.
 
 
 124
 1. Rule 606(b). Appellants' initial sally suggests that the lower court flouted Fed.R.Evid. 606(b).[18] The rule amalgamates the common law prohibition against using juror testimony to impeach a verdict, Tanner v. United States, 483 U.S. 107, 107 S.Ct. 2739, 2745-46, 97 L.Ed.2d 90 (1987), and a recognized exception: where extraneous influence has allegedly infected the panel, juror testimony should be allowed. Rushen v. Spain, 464 U.S. 114, 121 n. 5, 104 S.Ct. 453, 457 n. 5, 78 L.Ed.2d 267 (1983) (per curiam); Mattox v. United States, 146 U.S. 140, 149, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1982). Under 606(b)'s constraints, intrusions into the jury's deliberative processes are sharply curtailed; insofar as deliberations are concerned, the court is "precluded from investigating the subjective effects of any breach on any jurors." United States v. Howard, 506 F.2d 865, 869 (5th Cir.1975). This may be easier said than done: while the line between the jury's deliberations and the rest of the trial is fairly straightforward, there is a much finer line between "subjective" and "objective" matters. Realistically, appellate courts must grant the trier a margin of error in separating wheat from chaff.
 
 
 125
 Here, we think the court hewed close enough to the line. While a juror may from time to time have misconstrued the questioning and based his or her answers on an arguably subjective aspect of deliberations, the record leaves no doubt but that the judge was sensitive to the problem and in the main screened out such responses. Moreover, the court's prophylactic instructions alerted each juror, both before and during the inquiry, that the deliberative process itself was not a matter for discussion.[19] While the question is not free from all doubt--it will rarely be in this murky area--we have examined both the interview transcripts and the district court's rescript and cross-compared the two; in the course of that exercise, we do not find any cogent reason to believe that the judge recklessly invaded forbidden territory or improperly relied on the jurors' insights as to their subjective mental processes during deliberations in contravention of Rule 606(b).
 
 
 126
 2. Presumptive Prejudice. Defendants next assail the lower court's refusal to employ a Remmer-type presumption of prejudice. See Remmer I, 347 U.S. at 229, 74 S.Ct. at 451 (ex parte communication, contact, or tampering with a juror during the trial about a matter pending before the jury is presumptively prejudicial, placing a burden upon the government to establish harmlessness). In Remmer I, a third party offered money to a juror during the trial in exchange for a favorable outcome. The juror promptly reported the incident to the judge who, without informing defendant, referred the matter to the FBI. Following a guilty verdict, the defendant learned about the incident and sought a retrial. The district court held an evaluative hearing, deemed the FBI investigation adequate, and denied further relief. The court of appeals affirmed. 205 F.2d 277 (9th Cir.1953).
 
 
 127
 The Supreme Court was not so sanguine. It concluded that a post-verdict inquiry "with all interested parties permitted to participate" was an appropriate vehicle for gauging the incident's impact, but vacated the judgment and remanded "to determine whether the incident complained of was harmful to the [defendant]." 347 U.S. at 230. In a subsequent opinion in the same case, the Court made clear that the hearing should have focused not solely on the FBI's professionalism but also on the intrusion's effect vis-a-vis the juror. Remmer v. United States, 350 U.S. 377, 379, 76 S.Ct. 425, 426, 100 L.Ed. 435 (1956) (Remmer II ).
 
 
 128
 According to Remmer II, the "presumption" of prejudice fashioned by the Remmer I Court stemmed from "the paucity of information relating to the entire situation" and the "kind of facts alleged." Id. 350 U.S. at 379-80, 76 S.Ct. at 426-27. In the case at bar, neither of those preconditions obtain. As to the first precondition, the data available here is quantitatively and qualitatively satisfactory to permit meaningful review. There is an abundance of information rather than a paucity: all jurors and alternates were questioned exhaustively about both the magazine piece and the challenged predeliberation conversations. The absence of third party involvement made a broader hearing superfluous. The defendants, through counsel, were given an opportunity to attend the interviews and suggest areas for questioning. The court's written opinion and precise findings presented an extremely vivid picture of what happened and left no doubt as to the trial judge's assessment of how these events impacted upon the jurors.
 
 
 129
 The second precondition relates to "the kind of facts alleged." Id. at 380, 76 S.Ct. at 427. In Remmer, the claimed misconduct was bribery, a direct attempt improperly to influence the case's outcome. The claimed misconduct here, which involves no ex parte contact with any juror, is qualitatively different. The nature and import of this sort of difference was highlighted by the Court in Smith, 455 U.S. 209, 102 S.Ct. 940. There, a sitting juror, during the trial, applied for a job as an investigator in the prosecutor's office. When this was brought to light, the court conducted a post-verdict hearing, relied on the juror's testimony, found the juror unbiased, and ruled that the behavior, although regrettable, did not necessitate retrial. The Supreme Court refused to apply a Remmer-type presumption and impute juror bias, commenting that:
 
 
 130
 The[ ] cases demonstrate that due process does not require a new trial every time a juror has been placed in a potentially compromising situation ...; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in Remmer....
 
 
 131
 Smith, 455 U.S. at 217, 102 S.Ct. at 946. Thus, Smith requires a fair hearing for nonfrivolous claims of extraneous influence or the like, but does not strictly mandate the use of a rebuttable presumption in every case. Rather, the presumption is applicable only where there is an egregious tampering or third party communication which directly injects itself into the jury process. Put another way, the Remmer standard should be limited to cases of significant ex parte contacts with sitting jurors or those involving aggravated circumstances far beyond what has been shown here.
 
 
 132
 The case before us has none of the hallmarks necessary to animate such a presumption.[20] The Remmer Court "recognized the seriousness not only of the attempted bribe, which it characterized as 'presumptively prejudicial,' but also of the undisclosed investigation which was 'bound to impress the juror....' " Smith, 455 U.S. at 215-16, 102 S.Ct. at 944-45 (quoting Remmer I, 347 U.S. at 229, 74 S.Ct. at 451). Our case is a different breed of cat. The most significant disparities, we think, are that the Remmer bribe, unlike the magazine article (1) was unlawful in itself and (2) related directly to the matter pending before the jury. Here, the piece on Cardinale, while arguably exaggerated and in poor taste, did not refer to the case, the trial, the defendants, or their activities. We believe that the facts of the instant matter distinguish it from matters where the probability of jury prejudice was intolerably great. Compare United States v. Littlefield, 752 F.2d 1429, 1432 (9th Cir.1985) (magazine article on tax cheating, read in jury room during trial on fraudulent tax scheme); United States v. Perkins, 748 F.2d 1519, 1534 (11th Cir.1984) (juror's remarks during deliberations to the effect that he knew defendant); Howard, 506 F.2d at 867 (juror's disclosure to other jurors that defendant had been in trouble previously) with United States v. Uribe, 890 F.2d 554, 560-61 (1st Cir.1989) (posttrial disclosure that juror had previous disagreement with one defendant not presumptively prejudicial as to other defendant); Nazzaro, 889 F.2d at 1167-68 (newspaper story concerning corrupt police officers not presumptively prejudicial as to police officer defendant in unrelated case); United States v. Porcaro, 648 F.2d 753, 756-58 (1st Cir.1981) (no presumption of prejudice where newspaper pieces "contained no prejudicial characterizations of appellant himself, his reputation, prior acts, arrests, or convictions, nor any speculation as to his guilt or innocence"). Because the article was not "logically connected to material issues in the case ... to find a material connection between the extraneous information and the jury's verdict 'would require an assumption that the jury members reached an irrational conclusion.' " Dickson v. Sullivan, 849 F.2d 403, 407 (9th Cir.1988) (quoting United States v. Bagnariol, 665 F.2d 877, 888 (9th Cir.1981) (per curiam), cert. denied, 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982)). We will not essay so long a logical leap--nor will we fault the district court for eschewing it. Cf. Angiulo, at 1185 (ex parte contact more likely harmless if not pertinent to substantive matters at trial).
 
 
 133
 By the same token, the jurors' midtrial buzznacking also lacked the strong degree of probability needed to animate a Remmer-type presumption. See, e.g., Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961); Reynolds v. United States, 98 U.S. 145, 155-56, 25 L.Ed. 244 (1878). This is particularly so given the district court's express (and well substantiated) finding that no jury-room discussion had occurred "which reflected a fixed opinion or which would have influenced any other juror to close their [sic] mind to the remaining evidence." Boylan, 698 F.Supp. at 393.
 
 
 134
 3. Assessment of the Facts. Appellants also asseverate that the judge unreasonably and unsupportably denied them a new trial based on contamination of the jury. In approaching this issue, we adopt the Second Circuit's description of the beacon by which courts must steer: the criterion for a "post-verdict determination of extra-record prejudice must be an objective one, measured by reference to its probable effect on 'a hypothetical average juror.' " United States v. Calbas, 821 F.2d 887, 896 (2d Cir.1987), cert. denied, 485 U.S. 937, 108 S.Ct. 1114, 99 L.Ed.2d 275 (1988). In determining whether the trier strayed off course, we use an abuse-of-discretion compass.
 
 
 135
 In this instance, we find the district court's conclusions to be unimpugnable. Indeed, even if a Remmer-type presumption had come into play, it would be overcome by the cogency of the findings, 698 F.Supp. at 392-93, that the circulation of Boston magazine among some jurors, and the jurors' remarks during trial, whether viewed separately or collectively, were harmless. See United States v. Hornung, 848 F.2d 1040, 1044 n. 3 (10th Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1349, 103 L.Ed.2d 817 (1989); United States v. Hillard, 701 F.2d 1052, 1064 (2d Cir.), cert. denied, 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1318 (1983).
 
 
 136
 There is no necessity, drawing nigh the end of so protracted an opinion, to wax longiloquent. The jurors' assertions of continued impartiality, favorably appraised by the court, comprise testimonials that are not "inherently suspect," for a juror is "well qualified to say whether he has an unbiased mind in a certain matter." Smith, 455 U.S. at 217 n. 7, 102 S.Ct. at 946 n. 7 (quoting Dennis v. United States, 339 U.S. 162, 171, 70 S.Ct. 519, 523, 94 L.Ed. 734 (1950)); see also Angiulo, at 1186-87 (trial court may rely on juror's statement of continued impartiality); Butler, 822 F.2d at 1196 (juror's statement that improper contact would have no bearing was considered reliable); United States v. Pennell, 737 F.2d 521, 533 (6th Cir.1984) (court may rely upon juror assurances of continued impartiality).[21] On the whole, the record bulwarks the court's conclusion that the jurors' answers were credible and their statements reliable. The court's recital of a near-googol of other reasons indicating continued impartiality, 698 F.Supp. at 393, most based on personal observation, comports with the record and deserves great respect. Even though some jurors acknowledged commenting on the evidence, particularly in reference to defendant Sheehan, their discussions, as depicted in the majority of the interviews, were not so extensive or pervasive as necessarily to have affected the verdict's integrity.[22]
 
 
 137
 In short, the evidence adduced through the juror interviews indicated no actual bias. The trial judge's findings confirmed this conclusion. His record-rooted evaluation of the situation merits considerable weight. See Hunnewell, 891 F.2d at 961; Dickson, 849 F.2d at 405; United States v. Santiago-Fraticelli, 730 F.2d 828, 830 (1st Cir.1984). What is more, the judge instructed the jury on several occasions during the trial to keep their minds open, to remember the presumption of innocence, and the like. There is a presumption that the jurors followed these instructions--and nothing tangible here to surmount it. Appellants' claims of irremediable prejudice were sufficiently addressed and rebutted. There was no abuse of discretion anent the denial of posttrial relief.
 
 XI. CONCLUSION
 
 138
 We need go no further. Our trek through the long and sordid record indicates that these seven defendants were fairly tried and justly convicted. In the end, an impartial jury, confronted with a mass of powerful evidence, concluded that the badge had been tarnished. No reversible error appearing, the defendants' convictions are
 
 
 139
 Affirmed.
 
 
 140
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 [1]
 The charged sub-conspiracies were as follows:
 Count Series Defendants Charged
 3 A Connolly, Sheehan
 12 B Boylan, Carey, Kilroe, McCormick, Nave
 21 C Kilroe and "persons unknown"
 27 F Kilroe, Nave, Sheehan
 34 I Boylan, Connolly, Nave, Sheehan
 58 J Nave, Sheehan
 Except for count 58, all of the sub-conspiracies implicated the Hobbs Act and were characterized by the government as predicate acts for RICO purposes. Count 58 was brought under 18 U.S.C. Sec. 371 and was, therefore, not chargeable as a predicate offense under 18 U.S.C. Sec. 1961. Nevertheless, the underlying scheme--defrauding the United States of tax revenue--was so charged.
 
 
 [2]
 We have refrained from reliance on evidence anent Series J (the UL scheme) for purposes of evaluating evidentiary sufficiency in respect to the RICO conspiracy. We believe that conduct to be cut from a somewhat different cloth and discuss the matter in more detail infra Part V
 
 
 [3]
 Appellants requested the court to instruct that "[i]f you find any conspiracy charged did not exist then you must return a not guilty verdict as to that conspiracy even though you may find some other conspiracy, whether charged or not" (emphasis supplied)
 
 
 [4]
 These rules provide in pertinent part:
 Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.
 Fed.R.Crim.P. 8(b).
 If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.
 Fed.R.Crim.P. 14.
 
 
 [5]
 There was evidence that Boylan participated in the scheme to the extent of endorsing one check. Moreover, there was arguably an indirect connection in that UL paid for Sheehan's meals at Cafe Budapest, which was a "client" of Connolly's. In context, these trimtrams prove little of consequence
 
 
 [6]
 Because the predicate crimes involved in the sundry bar/restaurant/nightclubs sub-conspiracies could warrantably be found to fit within the scope of the omnibus RICO conspiracy, and because the district court instructed the jury adequately on the multiple conspiracy rule, see supra Part III(B), we need only consider prejudice stemming from the UL variance
 
 
 [7]
 The Appendix details the specific charges. To recapitulate briefly, we mention here only that Nave was paid money on numerous occasions by McGowan; Sheehan received many improper payments from Chaletzky; and both of them accepted gratuities from Tasse and the Blackes
 
 
 [8]
 Indeed, one of defendants' principal arguments is that the prejudice which they perceive was heightened because 28 of the first 29 trial witnesses dealt only with the UL affair. Although we think the lament is baseless, the circumstances illustrate the sort of tight compartmentalization which the district judge demanded throughout the trial
 
 
 [9]
 In H.J. Inc. v. Northwestern Bell Telephone Co., --- U.S. ----, 109 S.Ct. 2893, 2901, 106 L.Ed.2d 195 (1989), decided after completion of defendants' trial, the Court firmly rejected the notion that a single illegal scheme, even if conducted by multiple predicate acts, could never be enough, by itself, to make out a pattern of racketeering activity
 
 
 [10]
 Although both Muskovsky and Grayson antedated H.J. Inc., there is not the slightest reason to believe that a shadow has been cast over them. The issue resolved in H.J. Inc., whether multiple schemes must be proved to show the requisite pattern of racketeering activity, is distinct from the broader question of what the evidence must ultimately demonstrate as to relatedness and continuity. Placed in perspective, H.J. Inc. in no way beclouds Muskovsky, Grayson, or the jury instructions disputed here
 
 
 [11]
 In United States v. Bucci, 839 F.2d 825 (1st Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 117, 102 L.Ed.2d 91 (1988), we stated that the government could prove extortion "by showing that a defendant induced payment either through the use of actual or threatened force, violence, or fear, or under color of official right." Id. at 827; see also United States v. Rivera-Medina, 845 F.2d 12, 14 (1st Cir.) (same), cert. denied, --- U.S. ----, 109 S.Ct. 160, 102 L.Ed.2d 131 (1988). Neither case decided whether inducement was a necessary element of extortion "under color of official right"; the quoted language was intended only to clarify that the government need not show extortion both through fear of economic loss and under color of official right
 
 
 [12]
 We briefly mention two related sniper shots. First, appellants' complaint that the district court "confused the issue" by other statements in the charge exhibits greater imagination than logic. Although instructing separately on fear of economic loss (a practice consistent with Bucci, 839 F.2d at 827), the court did not retreat from its admonition that inducement was required on an "under color" claim. Second, the argument that the court's instructions were infected by the same viral strain which led to reversal in O'Grady seems altogether misplaced. The district court's instructions in O'Grady focused on inducement arising out of the naked fact of officeholding, without more. 742 F.2d at 688, 693. Here, unlike O'Grady, the inducement instruction was appropriately focused on defendants' actions while holding office
 
 
 [13]
 Appellants' argument that the court failed properly to instruct on conspiracy to commit extortion fails for much the same reasons. Although the instructions anent this specific crime did not explicitly elucidate the mens rea element, that portion of the charge was prefaced with the statement that the court's "earlier instruction as to conspiracy applies." Inasmuch as that earlier instruction dealt adequately with specific intent, no more was exigible
 
 
 [14]
 To cite one resounding example, the district court, struck a question propounded by Sheehan's attorney which assumed, and referred to, a witness' "homosexual preference for young men." The court declared at sidebar:
 Well, let's get this out of the way right here and now and hear me and hear me good. What does homosexual preference have to do with credibility? ... I will tell you now and I will tell you once.... I will take action against you if you bring up this witness' homosexual preference before this jury again. The reason I say that is obvious. Everybody in this room knows that mentioning homosexuality, accusing someone of homosexuality has such a proclivity, such a tendency to debase and humiliate a witness.... It has nothing to do with testimonial honesty. It has nothing whatsoever to do with it. So you will not and neither will any other ... counsel in this case refer to this witness' sexual preference.... In my judgment [the question] was offered for purpose of humiliating and degrading the witness.... It's not worth a hill of beans, compared to the probative value it offers. It has absolutely no value in this case....
 
 
 [15]
 The text reads:
 When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.
 Fed.R.Evid. 106.
 
 
 [16]
 Whether Rule 106 furnishes an independent ground for admissibility is an open question in this circuit. Courts elsewhere are divided. Compare United States v. Woolbright, 831 F.2d 1390, 1395 (8th Cir.1987) (Rule 106 addresses only order of proof) with United States v. Sutton, 801 F.2d 1346, 1368-69 (D.C.Cir.1986) (Rule 106 may provide independent basis for admissibility). Inasmuch as defendants' claim founders on other shoals, we need not resolve this conflict today
 
 
 [17]
 Occupying part of page 18 of Boston magazine's August 1988 issue entitled "All in the Family," the report offered thumbnail profiles of attorneys whom the "wise guys call" for legal representation. McCormick's trial counsel, Cardinale, was among those mentioned. The article stated in part:
 Anthony M. Cardinale, 37, of Boston: Specializes in defending extortion and racketeering cases. Every troubled mobster in town kisses Cardinale's ring sooner or later. "Every made guy we pick up has Cardinale's name in his wallet," a federal law-enforcement source says. When Cardinale wasn't representing Gennaro Angiulo, he was helping "Fat" Tony Salerno fight his 29-count indictment in New York City. Now he's handling Vinnie "The Pinhead" Ferrara's appeal against the U.S. government.
 
 
 [18]
 The rule states in pertinent part:
 Upon an inquiry into the validity of a verdict ..., a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or to dissent from the verdict or ... concerning the juror's mental processes ..., except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.
 Fed.R.Evid. 606(b).
 
 
 [19]
 In one of several such admonitions, the district court inveighed:
 I won't ask you about what happened during your deliberations. I am not going to ask you what was going on in your mind. Those were all secret. You don't have to explain your verdict to anybody.... But I do want to ask you about some other things that may have happened before you went to the jury room.
 
 
 [20]
 Because we conclude that the prerequisites for a Remmer presumption are not met in the case at bar, we need not chart with precision the reach of the Remmer rule in the albedo of Smith and Rushen. See Angiulo, at 1185 (leaving question open)
 
 
 [21]
 To be sure, we recognize that a juror may be reluctant to impeach the verdict or "to admit that he himself acted improperly." Smith, 455 U.S. at 236, 102 S.Ct. at 956 (Marshall, J., dissenting). But, there are telltales in the record to indicate that these jurors were especially forthcoming. Several of the jurors admitted reading Boston magazine; there was no suggestion of a connection between it and the defendants; in fact, several jurors stated that it had nothing to do with the case. And the judge set forth a number of other reasons to bolster his conclusion that, in this inquiry, the jurors were forthcoming. See, e.g., Boylan, 698 F.Supp. at 392-93
 
 
 [22]
 Interestingly, only seven out of the jurors confirmed that any comments had been made about the case. See Boylan, 698 F.Supp. at 380, 392. It is also noteworthy that the judge found, supportably in our view, that: "No juror corroborated the original juror's account" of the remarks supposedly made anent defendants' guilt. Id. at 392-93